PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

DANIEL PASTOR (CABN 297948)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    daniel.pastor@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>NATALIE MARIE GONZALEZ,<br><br>    Defendant. | NO. 23-CR-345-TLT-1<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Judge: Hon. Trina L. Thompson<br>Date:  March 28, 2025<br>Time:  10:00 A.M. |

## I. INTRODUCTION

Natalie Gonzalez (age 31) pleaded guilty to count one of the captioned indictment charging her with Conspiracy to Distribute a Mixture and Substance containing Methamphetamine in September 2024. PSR ¶ 2. Gonzalez managed a drug trafficking delivery service known as "The Shop" that sold a broad range of controlled substances to customers across the San Francisco Bay Area. Gonzalez supplied not only drug users but also drug dealers including a DEA undercover agent who was introduced to her as a drug dealer. Gonzalez paid delivery drivers—including her co-defendants Frederick Gaestel, Matthew Sestak, and Rory Rickey—to deliver methamphetamine pills, cocaine, and

other drugs to customers that placed orders through the encrypted app Signal.  Gonzalez's business had a $300 minimum for Bay Area delivery orders and for mail orders.

The "Menu" for Gonzalez's group stated that it accepted cryptocurrency as payment for drug orders ("if you don't already have crypto, we'll walk you through it").  Gonzalez later explained to a DEA undercover agent (UC) that her customer base was "a lot of students and young professionals" and that the organization's drivers drove regular weekly drug delivery routes through different parts of the Bay Area.

## II. SENTENCING GUIDELINES CALCULATIONS

As reflected in the Plea Agreement, the parties calculated the Sentencing Guidelines for Gonzalez's offense as follows:

| | | | |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2D1.1(a)(5), (c)(4) | | 32 |
| b. | Role Adjustment (leader/organizer), U.S.S.G. § 3B1.1(c) | | +2 |
| c. | Acceptance of Responsibility, U.S.S.G. § 3E1.1 | | -3 |
| d. | Zero-Point Offender, U.S.S.G. § 4C1.1 | | -2 |
| e. | Group Disposition Departure, § 5K2.0(a)(2)(B) | | -2 |
| f. | Total Offense Level: | | 27 |

*See* Dkt. 65 at 6.  Based on the offense level calculation in the plea agreement, the government agreed to recommend a sentence no higher than 70 months (Dkt. 115 at 12), unless the defendant violates the plea agreement or fails to accept responsibility.

U.S. Probation disagrees with the plea agreement's guidelines calculation. The probation officer notes that Gonzalez does <u>not</u> qualify as a zero-point offender because she was a leader/organizer of the criminal conduct.  PSR ¶¶ 4, 57-66.  The probation officer therefore calculates Gonzalez to be at offense level 31 or at offense level 29 (if the Court accepts the global resolution departure) with an advisory guidelines range of 108-135 months (at offense level 31) or 87-108 months (at offense level 29).

## III. DISCUSSION

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to rehabilitate the defendant.  18 U.S.C. § 3553(a)(2); *United States*

*v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Guidelines are "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

Section 3553(a) sets forth factors that the Court must consider in determining an appropriate sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims. 18 U.S.C. § 3553(a); *Carty*, 520 F.3d at 991. Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

### A. The Offense – A Sophisticated "Door Dash" Drug Delivery Conspiracy

#### 1. The Scale and Sophistication of Gonzalez's Drug Conspiracy

In her plea agreement, Gonzalez admits that from *at least as early* as April 2023 through her arrest on September 13, 2023, she managed the drug trafficking delivery service known as the "The Shop" which supplied methamphetamine pills, cocaine, and other drugs to customers in the Bay Area that placed orders through the encrypted app Signal. Dkt. 115 at 2. Gonzalez admits that she paid her co-defendant delivery drivers (Gaestel, Sestak, and Rickey) to deliver drugs to the group's customers and to accept payments on behalf of the group. *Id.*

Gonzalez's drug operation "The Shop" functioned as a drug bazaar for her customer base—which she described as primarily "students and young professionals" (PSR ¶ 11). Gonzalez profited by distributing drugs to these young-adult customers who she encouraged to order in bulk: "We have a $300 minimum order for postal shipments and Bay Area delivery" (Dkt. 115 at 4). PSR ¶ 11. Gonzalez also profited by providing a steady flow of illegal drugs through convenient weekly deliveries made by her drivers on regular routes throughout the Bay Area.

In addition, Gonzalez profited by marketing her drug business as offering the convenience of Silicon Valley order-and-delivery apps. Gonzalez encouraged customers accepting drug deliveries to: "Hop in for a short 'Uber' ride around the block – Get your order through the window like Door Dash." And similarly to weekly food delivery services, Gonzalez reminded customers to: "Order by the night

before relevant delivery day to receive your order"/ "SF deliveries are WEDNESDAY night 8-11p"/ "EAST BAY deliveries are THURSDAY night 8-11pm."

When federal agents searched the group's drug stash house on Henderson Place in Menlo Park, they found (among other drugs): (1) roughly 7 kilograms of cocaine in separately shaped bricks, (2) Ziploc bags full of orange pills with the stamps of prescription Adderall medication weighing roughly 1,773 grams, and (3) bags of ketamine weighing roughly 12 kilograms. *See* PSR ¶ 48; Dkt. 115 at 6. The pills were tested at a DEA lab and found to contain methamphetamine (not Adderall). *Id.* The large drug quantities found at the group's stash house demonstrate the scale of The Shop's drug distribution operation and suggest that its business model was a successful one.

At the stash house, agents also found a square brick of fentanyl labeled "fentanyl" that was found in a zipper-closed carry-on bag that was labeled "DO NOT OPEN" inside of a cardboard box labeled "DO NOT OPEN." The substance labeled fentanyl was tested at a DEA laboratory and found to be roughly 21% pure fentanyl with a weight of roughly 990 grams. The cocaine was tested at the DEA lab and confirmed to be cocaine with a net weight of roughly 6,997 grams. PSR ¶ 48; Dkt. 115 at 6.

### 2. Gonzalez Sold Bulk Quantities to the UC Who Represented that He Resold Fake Adderall Pills to Other Suppliers.

In April 2023 when a DEA Confidential Source (CS) introduced an undercover agent (UC) to Gonzalez as a drug dealer looking for a reliable source of supply, Gonzalez's business appeared to be booming. The drug menu that Gonzalez sent to the UC showed that The Shop offered a large variety of drugs and it announced: "NOTICE: WE'RE HIRING!" / "We need more delivery drivers . . . Please reach out if you or a trusted friend is interested." PSR ¶ 23.

As the UC developed a relationship with Gonzalez, the UC revealed that he was ordering bulk quantities of fake Adderall pills to re-sell to his own purported customers. The UC informed Gonzalez that he sold full boats to persons with whom the UC worked: "reason I ask about bulk, is cause I sell bs [boats] to friends I've been working with a while." Gonzalez had no issue supplying multiple "boats" (1,000-pill quantities) to the UC but wanted to know what type of clientele the UC served. PSR ¶ 30. The UC messaged Gonzalez that he sold to "college kids/my post grad friends…" *Id*.

Although Gonzalez (who used the alias "Soter" on Signal) informed the UC that she wanted to "make sure we are sharing responsibly rather than contributing to addict[ions] that are damaging people," she assumed that the sale of fake Adderall pills containing methamphetamine to "college kids" and "post grads" would not have harmful effects and contribute to addictions.   In the current drug environment, however, any unknown pill or any line of supposed cocaine could turn out to contain fentanyl and therefore to be deadly.





### 3. Drug Money as Cash and Crypto

When Gonzalez's residence was searched during her arrest, agents seized $215,415 from a safe in Gonzalez's bedroom. PSR ¶ 46.[1] Agents also seized roughly $16,137 from co-defendant Gaestel's bedroom at the group's drug stash house in Menlo Park and $3,800 in cash from the white Subaru that Gaestel drove on drug runs. PSR ¶ 48.

Along with cash, the investigation showed that the Shop accepted cryptocurrency payments from its drug customers. Gonzalez gave the UC different crypto addresses to which she directed the UC to send Bitcoin in exchange for his purchase of 4,000 fake Adderall pills for roughly $6,000 on August 24, 2023. PSR ¶¶ 36, 43. Gonzalez advertised on the Shop's Menu that the group accepted crypto and promised to help customers make payments who were unfamiliar with crypto.

During the August 24, 2023 meeting between the UC and co-defendant Rory Rickey, Rickey told the UC that the Shop conducted large cryptocurrency for cash exchanges in which the group charged a percentage of the transaction as a service fee. PSR ¶ 43.[2] This sort of undocumented crypto/cash transfer is known as a peer-to-peer exchange. It is often sought out by persons holding criminal proceeds (dirty money) they want to "cash out" without going through an established cryptocurrency exchange such as Coinbase, Binance, or Kraken, which allow users to convert crypto to fiat currencies. Regulated crypto exchanges require customers to provide identifying know-your-customer information (KYC) such as images of ID cards. Licensed crypto exchanges also keep records of their customers' cryptocurrency trades. It is now widely understood that law enforcement can trace crypto criminal proceeds from unhosted wallets (lacking attribution information) until the proceeds reach a cryptocurrency exchange that maintains KYC or a blockchain address with a known owner. A peer-to-peer exchange of cryptocurrency for cash frustrates these tracing efforts and allows a person with criminal proceeds to cash them out without detailed records being created.

---

[1] Gonzalez claims that some of the seized cash was an inheritance that she initially deposited into her bank account but later withdrew and kept in cash in the safe. Along with the cash, agents found a letter from the estate trustee of one of Gonzalez's relatives. To avoid collateral litigation, the parties have agreed that the defendant will forfeit $135,415 in cash that was seized. Dkt. 115 at 9.

[2] In late July 2023, however, Gonzalez had told the UC that the group did not buy crypto from others in exchange for cash (see image below). Gonzalez acknowledged accepting Bitcoin from her drug customers. *Id.*

Gonzalez highlighted her familiarity with tracing and use of crypto in her drug business by advising the UC about how to obscure Bitcoin (BTC) earnings from the UC's purported drug sales by moving his Bitcoin proceeds through the mixer "Incognito" so that "your shit won't be tagged as dirty ever." PSR ¶ 35 and below. "A crypto mixer is a service that blends the cryptocurrencies of many users together to obfuscate the origins and owners of the funds . . . [C]riminals use mixers to obscure the connection between the crypto wallets they use to collect their illicit profits and the crypto wallets from which they transfer their funds to crypto-to-fiat exchanges. In this way, they aim to avoid triggering anti-money laundering alerts"[3] when they cash out cryptocurrency for U.S. dollars or other fiat currencies.

 

Agents sought to trace the flow of Bitcoin through the BTC addresses that Gonzalez provided to the UC for him to pay her for the purchase of the pills containing methamphetamine. Agents' tracing shows that these addresses sent Bitcoin to addresses associated with the Incognito mixer; however, agents were unable to trace Bitcoin from these wallets through the Incognito mixer. Should the government's tracing efforts prove successful in the future and should the government seize Bitcoin traceable back to the addresses Gonzalez gave to the UC, Gonzalez has forfeited her claim to such Bitcoin in the plea agreement. *See* Dkt. 115 at 10 (¶ 11). Based on public blockchain information, the

---

[3] Chainalysis, "What is a Crypto Mixer?", https://www.chainalysis.com/blog/crypto-mixers/.

1  government calculates that there were roughly 111 Bitcoin payments made to one of the wallets and 50
2  Bitcoin payments made to the other wallet.
3        In any event, based on the cash seized from Gonzalez and Gaestel, the amount of drugs seized
4  from the stash house, Gonzalez's acceptance and encouragement of cryptocurrency as a form of
5  payment for drugs, Gonzalez's sending the Bitcoin addresses to the UC for him to make payment, and
6  Gonzalez's messages with the UC about the mixer Incognito discussed above, the government believes
7  that Gonzalez obtained a significant amount of drug proceeds in Bitcoin.

      **4.    Gonzalez's Cocaine Supplier Overdoses in a Hotel Room Where Her Driver Matthew Sestak was Staying.**

10        In May 2023, the CS spoke with Gonzalez about the death of her cocaine supplier in a Los
11  Angeles hotel room where co-defendant and Shop delivery driver Matthew Sestak was staying. The
12  DEA investigated and learned that on May 11, 2023, hotel staff at a Hilton Garden Inn in Valencia, CA,
13  found a deceased man in Room 274. Agents learned that co-defendant Sestak had been staying in that
14  room the night before and that Gonzalez had called and given authorization for her credit card to be used
15  to book the room. Gonzalez provided hotel staff with a scan of her Colorado driver's license and a
16  credit card authorization statement (below).

[Credit Card Authorization form: "I, Natalie Gonzalez do hereby authorize Hilton Garden Inn to bill the following charges to the credit card indicated below: Credit Card Information — Cardholder's Name: Natalie M Gonzalez; Credit Card Type: VISA; Credit Card Number: [redacted] 8329; Expiration Date: [redacted]; Company Name: Roselyn Botanicals; Phone Number: [redacted]; Signature: Nat[...]. The following must be provided with this form in order to hold bookings on a definite basis: A CLEAR Photo copy of the front and back of the credit card, with the cardholder's signature. A CLEAR Photo copy of the cardholder's valid driver's license (photo identification). Guest Name/Group Event: Matthew Sestak; Arrival Date: 5/10/23; Departure Date: 5/11/23; Confirmation #: [redacted]"]

26        While the death of Gonzalez's cocaine supplier should have been a wake-up call about the
27  dangers inherent in distributing illegal drugs—whether cocaine or pills not dispensed by a pharmacy—
28

GOV. SENTENCING MEMO                          8
NO. 23-CR-345-TLT-1

Gonzalez continued the Shop's operations. After the death of the cocaine supplier via drug overdose, Gonzalez began purchasing kilograms from a different supplier operating in the Bay Area.

On September 13, 2023, when fentanyl was seized from the Menlo Park stash house and Gonzalez and her co-defendants were arrested, agents questioned Gonzalez's boyfriend about the fentanyl that was seized from the stash house. PSR ¶ 49. Gonzalez's boyfriend was surprised that fentanyl had been found there but also stated that it was set for disposal and had a warning label on the bag. *Id.* According to Gonzalez's boyfriend, the cartel would give them cocaine and then eventually provided fentanyl, and fentanyl cannot be returned to the cartel. *Id.* When agents asked the boyfriend if he had a current cocaine source, the boyfriend stated that the source had overdosed. *Id.* He explained that the cocaine source had been "bait and switched" (*id.*), which agents understood to mean that the cocaine supplier had ingested a lethal dose of fentanyl believing that the white powder he ingested was cocaine.

### B.    Other 3553 Factors

Gonzalez was raised in the small town of Bailey, Colorado by both parents in what she described as a loving and supportive environment. PSR ¶ 77. Gonzalez was a recipient of a competitive national young scholars program through which she received "comprehensive educational advising and financial support from the 8th grade through high school to pursue her academic and talent goals." PSR ¶ 78. Gonzalez received over $30,000 in stipends to pay for dance and violin lessons, summer programs, and extracurricular activities such as a service trip to Peru. *Id.*

After the 2008 financial crash, Gonzalez's parents filed for bankruptcy and her father was later offered a project manager position in Afghanistan where he went for roughly three months. PSR ¶ 81. Around this time, Gonzalez reported that she started smoking marijuana heavily and drinking a lot at parties. *Id.* Nonetheless, Gonzalez was accepted to Stanford University as an undergraduate student and received a Bachelor of Science degree in Civil and Environmental Engineering and Architectural Design. PSR ¶ 95. From 2019 to 2021, Gonzalez attempted to start multiple entrepreneurial ventures that "either flopped or dissipated due to the COVID-19 pandemic." PSR ¶ 98. More recently, she and her boyfriend have been working on a skin care venture called Beselan Botanicals. PSR ¶ 96.

\\

**C.      Gonzalez is Differently Situated from Her Co-Defendants and Should Receive a More Serious Sentence.**

Gonzalez admits that she was the leader of a drug delivery service and that her co-defendants worked for her as delivery drivers. Her co-defendants were her employees, not her business partners. Gonzalez admits to facts about the Shop's operation that show why it was a profitable enterprise. The evidence shows that Gonzalez ran the operation and that her co-defendants needed her approval before committing to any deals. The co-defendants are being held responsible for their conduct, but each had his own issues that led him to become part of the conspiracy in lesser roles. Matthew Sestak had longstanding substance abuse issues. Frederick Gaestel had a previous criminal record and a thin employment history. Rory Rickey was struggling in college and dealing with conflicts with his family.

In contrast, Gonzalez came from a comfortable upbringing. She was raised in a generally stable family environment, won a scholarship that supported numerous extracurricular activities, and gained admission to Stanford University where she received a degree. She enjoyed substantial advantages in life. However, instead of using her intelligence and her social connections to obtain lawful employment or to continue striving to succeed as an entrepreneur, she created a Silicon Valley drug delivery service to enrich herself. She naively believed that in delivering a steady flow of drugs to young adults, she was not causing harm or contributing to addictions. Despite her awareness of the dangers of fentanyl, and having those dangers illustrated in the most dramatic and tragic way with the death of her cocaine supplier, she nonetheless continued her drug business and found another supplier.

Gonzalez sold to drug consumers and was willing to supply the UC (who posed as a drug dealer) with significant quantities of pills containing methamphetamine for the UC to sell as part of his supposed drug business. In terms of avoiding unwarranted sentencing disparities, Gonzalez's co-defendants are not the appropriate comparators. The government respectfully submits that a more relevant comparison is how a drug distributor running a regional business in which the defendant was a leader/organizer would be evaluated. While Gonzalez's Stanford education makes her an unusual drug defendant, her role and conduct as the leader of a drug conspiracy is not unique. The Court must consider the 3553(a) factors with respect to Gonzalez as an individual; however, she is quite differently situated from her co-defendants and should receive a more serious sentence.

## IV. CONCLUSION

In accordance with the parties' plea agreement, the government respectfully recommends that the Court sentence Gonzalez to 70 months in prison, 3 years of supervised release, and the terms and conditions of supervised release recommended by U.S. Probation.

DATED: March 25, 2025                                          Respectfully submitted,

PATRICK D. ROBBINS
Acting United States Attorney

/s/
DANIEL PASTOR
Assistant United States Attorney