DAVID W. RIZK – CABN # 284376
RIZK & SHEARER LLP
466 Geary Street, Suite 201
San Francisco, CA 94102
Telephone:   (415) 517-9044
Email:       drizk@rs-llp.com

Counsel for Defendant GONZALEZ

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NATALIE GONZALEZ,<br><br>Defendant. | **Case No.:** CR 23-345 TLT<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**<br><br><u>**REDACTED**</u> |

## I.    INTRODUCTION

Defendant Natalie Gonzalez is before the Court in this drug case; her story is highly unusual and presents a conundrum for the Court at sentencing.

Ms. Gonzalez grew up in an environment in which recreational drug use was not just tolerated but encouraged. She was born at home, when her mother was 41 years old. Her parents were hippies. They raised their children in the mountains in Colorado, spoke openly about their use of psychedelics, and ate all-organic before it was popularized. The pursuit of material wealth was not a priority in her family. Both parents were self-employed, and Ms. Gonzalez's father (a contractor) built the house they live in today himself. Ms. Gonzalez grew up free-spirited and developed holistic interests.

Ms. Gonzalez is also extremely talented and smart. In eighth grade, she earned a highly

competitive, merit-based scholarship from the Jack Kent Cooke Foundation that provided substantial financial support for high-performing, low-income students, from middle school to college.[1] At Stanford, she continued to receive financial aid and lived in a student co-op where her alternative lifestyle was embraced, and she felt at home. Recreational drug use among the college students was common, which reinforced her view that even illegal drugs could be used responsibly, and that some substances, like ketamine, psilocybin, and LSD, offered potential benefits that far exceeded those of social-accepted drugs like alcohol. She believed that adults ought to have the opportunity to explore altered states, provided doing so did not harm others. At the co-op, and at events like Burning Man, Ms. Gonzalez found a community that believed in the therapeutic value of substances and encouraged experimentation. She also found her longtime partner Colin at this stage of her life.

Ms. Gonzalez graduated from Stanford in 2015 with a B.S. in Architectural Design. She never envisioned herself chasing a corporate job and instead hoped to work on environmental projects that were socially productive. For example, after college she worked as an afterschool program manager at Hidden Villa, a small-scale, organic farm that teaches outdoor education and sustainable agriculture to local school children. Ms. Gonzalez also contributed to a series of entrepreneurial projects focused on climate/environmental issues, which ultimately wound down during the pandemic.

On the side, however, Ms. Gonzalez started selling recreational drugs, including marijuana, mushrooms, LSD, ecstasy, mescaline, ketamine, and more obscure substances like DMT (a naturally occurring psychedelic). She rationalized this choice to herself because she believed she could provide unadulterated substances that would be tested and safe for recreational use by responsible adults. Those around her—including friends and even family members—expressed idealistic support for "safe access." Ms. Gonzalez saved the proceeds of drug sales for her long-term goal of buying some rural land and opening a spiritual retreat center. All those savings have now been forfeited to the government.

Ms. Gonzalez's sales were mostly ketamine, as it grew in popularity recently. Over time,

---

[1] *See* Jack Kent Cook Foundation,Young Scholars Program, *available at* https://www.jkcf.org/our-scholarships/young-scholars-program/ (last visited Mar. 10, 2025).

however, her idealistic project of safely selling psychedelics became increasingly misguided. She agreed to start selling cocaine, which she rationalized as consistent with her principles by testing to ensure it was not laced with deadly fentanyl—an increasing threat in the years after the pandemic. Ms. Gonzalez paid drivers, her co-defendants Matt Sestak, Rory Rickey, and Freddy Gaestel, to deliver the drugs to buyers and accepted payment in cryptocurrency. Shortly before Ms. Gonzalez was arrested in 2023, a woman who made and sold her benzodiazepines connected her to fake Adderall (amphetamine) pills for sale during a nationwide shortage. Ms. Gonzalez deluded herself into thinking she could provide a safe substitute, which was desoyxn (methamphetamine hydrochloride). The person who connected her to the supply of pills was caught by the DEA and promptly turned in Ms. Gonzalez, as well as others, in exchange for leniency from the government.

Ms. Gonzalez accepted responsibility for her actions and turned toward reflection. Since her arrest over a year ago, she has come to see her history from a different view. The scope of Ms. Gonzalez's drugs sales was small and limited to substances like ketamine and LSD, until it escalated rather quickly at the end. She justified getting involved in harder drugs as a harm reduction measure when she of course should have recognized that the alternative was of course not to participate in such a dangerous and harmful trade at all. Her judgment and social calibration were skewed in part because she was inundated in a community that endorsed harm reduction, legalization, and safe access. While in this thrall, Ms. Gonzalez herself had also been using GHB, a depressant like alcohol, every day for most of the day. It followed drinking too much starting as a teenager. Thankfully, after this case was instituted, Ms. Gonzalez was able to give up substances and limit her drinking quickly and without too much assistance; she attended counseling for a month at the beginning of her pretrial supervision and has never tested positive.

Since her arrest, Ms. Gonzalez has been working in various capacities, including as a legislative aide for a city council member in Berkeley (who has written in her support). Rizk Decl., Ex A. at 63 (letter of Ben Bartlett). She returned to Stanford to complete her Master's degree in Sustainable Design and Construction (a socially-conscious field somewhat akin to Habitat for Humanity), which she is now just a few months from finishing. One of her lecturers at Stanford took the time to write to the Court: "Natalie distinguished herself as the top student in the class. Natalie is

also the most impressive and promising student that I've had over the three years that I've offered this course and the five years I have been teaching at Stanford." *Id.*, Ex. A at 7-8 (letter of Michael Lin). The other extraordinary letters to the Court from Ms. Gonzalez's friends and family make it clear that she is a much-loved woman: generous, caring, intellectually gifted, and idealistic. For example:

> Throughout the years, I have witnessed Natalie's unwavering dedication to her community. Her involvement has not merely been as a participant but as a leader who inspires others to join her in acts of kindness and service. I have seen her work tirelessly with children, providing mentorship and encouragement, and with the elderly, offering care and companionship with remarkable empathy. Her commitment to environmental sustainability is equally inspiring; she continuously advocates for responsible stewardship of our natural resources.

*Id.*, Ex. A at 17-18 (letter of Brent Adam).

In the future, Ms. Gonzalez desperately wants to have children and is feeling fearful that a sentence from the Court may limit her ability to become a mother. The sentence will also necessarily interfere with Ms. Gonzalez's next steps in life with her education and eventual career, of course. For somebody like Ms. Gonzalez, who has never been arrested and never spent more than a day in jail to date, the prospect of a significant sentence in federal prison is extremely daunting. Any sentence longer than a year or two would represent severe punishment and change Ms. Gonzalez profoundly, but a sentence of 70 months, as the government requests, would be clearly excessive—far greater than is necessary or "sufficient" as the sentencing statute requires. *See* 18 U.S.C. § 3553(a). That is demonstrated by the Sentencing Commission's own data (discussed below), showing that the average sentence for defendants facing identical exposure under the Guidelines in the last five years nationally was 30-35 months.

A longer sentence would be profoundly counterproductive. The government's recommendation of 70 months would be quite excessive given the circumstances here—especially given that this a non-violent drug case for a first-time offender. Such a long sentence would frankly be well out of the norm in this district, even for a relatively serious case in federal court. Indeed, it is *twice as long* as the national average sentence for the Guidelines agreed to by the parties. U.S. Probation's substantial

downward variance and recommendation of 48 months instead, also shows how far off the government's recommendation is.

Here, Ms. Gonzalez respectfully asks the Court for a sentence of no more than 30 months, followed by three years of supervised release. She does so, recognizing the seriousness of her offense, and that even 30 months is a devastating and truly life-altering sentence for a young woman in a non-violent drug case who has no prior criminal history. Ms. Gonzalez is still a bright and promising talent who would benefit from the Court's intervention and attention moving forward. She is a promising candidate for rehabilitation in the community under strict conditions. The defense respectfully urges that the Court's sentence should enable Ms. Gonzalez to fulfill her potential for the benefit of our community.

## II.    BACKGROUND

Ms. Gonzalez's parents Louis Gonzalez and Patrice Hufnagel met while working in a ski area in Colorado. Ms. Gonzalez describes her parents affectionately as "mountain hippies." Mr. Gonzalez came from a Catholic Cuban family of doctors that emigrated after Castro came to power. He was set to go to medical school but then spent a summer in Colorado and never went back. Her mother came from a frugal Lutheran family of schoolteachers. Mr. Gonzalez and Ms. Hufnagel raised their daughter and her older brother Maximillian in the small, unincorporated rural town of Bailey, Colorado (population: 8,042, elevation: 7,740 ft.). Mr. Gonzalez was a self-employed contractor and Ms. Hufnagel worked as a massage therapist and substitute teacher. They valued relationships and their community and living a rich life ("made up of friendships, good food, and a great view") over traditional accomplishments and material wealth. Ms. Gonzalez recalls road trips and enjoying the outdoors with her family As Ms. Gonzalez's mother explains, she and her husband intended to raise their children as "heart-motivated people, with resilience and passion for living." Because they were self-employed, Ms. Gonzalez's parents were very involved and present in raising their children.

The parents also encouraged their children in the arts and in school. Ms. Gonzalez started taking dancing classes and violin lessons at a young age, which bloomed into ballet and orchestra later in high school. Because the family could hardly afford such enrichment activities, they were supported by grandparents and Ms. Hufnagel's older sister, a lawyer and a judge. Ms. Gonzalez was

"a big fish in a small pond" in Bailey. There were 120 students in her graduating class in high school, almost all of whom had attended school together since kindergarten. She was extremely active in school activities, participating in track, speech and debate. She excelled in math in particular, and was placed on an advanced track in seventh grade. Around that time, she registered the highest score any student in her high school had ever scored on a standardized exam, and was selected by the Jack Kent Cooke Young Scholar program as one of approximately 50 students nationwide to receive an extraordinary package of financial aid during middle school and high school to support her education, after school activities, and learning over the summer at "nerd" camps on college campuses. By her sophomore year, Ms. Gonzalez had completed AP Calculus and run out of math classes so she went to a nearby college to continue higher level college courses.

Her middle school career was punctuated by a terribly traumatic tragedy, however. A gunman took a classroom on campus hostage. Ms. Gonzalez and her classmates were hustled out of the cafeteria by teachers. A police SWAT team descended and began negotiating for releases. The daughter of one of the Gonzalez's family's closest friends, Emily, was one of the last hostages who had been negotiating for the gunman, and she was shot to death when police ultimately rushed the classroom.[2] Emily's twin brother Casey was Max's best friend, and her father was a family business partner. The circle of families was profoundly shocked and devastated, but the experience brought Ms. Gonzalez closer to a circle of teens several years older. Ms. Gonzalez's family contributed to forming a foundation named after Emily's last text to her family ("I Luv U Guys"). Casey's thoughtful letter to the Court explains what Ms. Gonzalez and her family meant in that moment. Rizk Decl., Ex. A at 20-22 (letter of Casey-John Keyes).

Ms. Gonzalez's parents were quite social and open minded and threw parties for their friends. Alcohol and marijuana were around and her parents took a tolerant view, believing that it was better for their teens to introduced to alcohol at home rather than elsewhere. In retrospect, Ms. Gonzalez recognizes that the drinking at these events was unhealthy and led her to underestimate the dangers

---

[2] *See*  The Denver Post, "Teenage hostage fatally shot after authorities stormed a Platte Canyon high school," Sept. 6, 2006, *available at* https://www.denverpost.com/2006/09/27/hostage-horror/ (last accessed Mar. 2, 2025).

posed by drugs. In high school, she tried mushrooms, and later MDMA. Later in high school, she became dependent on marijuana which she used heavily for a couple years.

The family was further roiled by the housing crisis in 2008, which leveled the contracting business. Mr. Gonzalez declared bankruptcy, and the family nearly lost their home, which he had built himself. It was an extremely stressful time for the family. Desperate, Mr. Gonzalez was forced to take a contracting job in Afghanistan, which was of course dangerous and a deeply disturbing experience. Ms. Gonzalez was left at home with her mother since her brother Max had already gone away to college. It was during this period that Ms. Gonzalez struggled, and began smoking marijuana and drinking heavily as a coping mechanism. Her mother's letter to the Court notes that Ms. Gonzalez struggled with her focus on academics during this period but ultimately pulled through it. Ms. Gonzalez graduated from her high school Valedictorian.

Stanford was far more challenging for Ms. Gonzalez. Indeed, it first it was quite intimidating. She was thrust into an environment where she felt somewhat like an outsider. She was persistent, however. She joined and later led a dance group, and let a student group called Project Motivation that brought minority and low income students to campus for tours and panels to generate excitement about attending college. Ms. Gonzalez also joined a multicultural sorority (Sigma Theta Psi), before ultimately finding her community at a campus co-op. She took a variety of courses and explored various majors ranging from psychology to international relations, before ultimately landing on Architectural Design within the Civil and Environmental Engineering Department. The program combined engineering, design, and environmental concerns. After studying architecture abroad, she spent a summer volunteering on organic farms, which engendered her interest in sustainable agriculture. She continued to work hard to balance her social life and studies, which were demanding. Ms. Gonzalez recalls working very late nights on architecture projects. At the co-ops, significantly, drug use (marijuana, MDMA, psychedelics) was embraced. Ms. Gonzalez met her partner Colin during the end of her junior year of college. She graduated from Stanford in 2015 and recalls it as being somewhat stressful. She fell into a habit of comparing herself to others and lost the self-confidence she had developed during high school. She had symptoms of "impostor syndrome" when it came to applying for jobs and doubted her qualifications.

After college, she moved to Sonoma County with Colin. They went to Burning Man, and the Telluride Mushroom Festival, both venues where Ms. Gonzalez was exposed to recreational drug use that seemed to be fairly safe. She worked for a natural builder architect informally, and as a nanny. She found she loved kids and early childhood development. In 2016, she returned to Stanford and began attending classes for her Master's degree in Sustainable Design and Construction, although she was feeling at the time uncertain about her direction. After a quarter, she decided to stop and moved to the mountains in Santa Cruz, where she continued nannying, and also worked as a substitute teacher in a nearby preschool modeled after Waldorf principles. She *loved* working there. Parttime she also worked at Hidden Villa, the outdoor education and farm program where she planned lessons activities for school children ranging from tracking wildlife to raising chickens.

In 2019, Ms. Gonzalez became interested in running self-development and spiritual retreats. She began planning three-day retreats that included qigong (a Chinese practice), meditation, nature immersion, and homemade foods. The retreats were hosted by a neighbor, a retired U.C. Santa Cruz astrobiologist who had worked with NASA and recently gone public about his own use of psychedelics for research purposes. He inspired Ms. Gonzalez to work with him on a climate-related entrepreneurial project for some time before it unwound during the beginning of the COVID-19 pandemic.

In 2020, Ms. Gonzalez had an unexpected medical issue: ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████.

Afterward, she and Colin moved back to the Bay Area. It was a difficult time due to the

pandemic, layoffs, and fears of recession. Ms. Gonzalez started to grow mushrooms to sell to friends and friends of friends. That expanded to college and graduate students, tech workers, psychedelic therapists, and party-goers at festivals like Burning Man. Ms. Gonzalez also referred customers to therapists and psychedelic guides that offered a curated experience, just as psychedelics' therapeutic purposes were gaining more mainstream recognition during the pandemic. Over time, some of her buyers started requesting other drugs, including ketamine, which became quite popular, and occasionally cocaine.

At around the same time, the nationwide fentanyl epidemic emerged. Ms. Gonzalez believed that she could provide safer drugs by testing for contaminants and convinced herself that it was sufficient to offer safety cautionaries, and vet her customers for responsible practices. At this point, she was mostly surrounded by people who were interested in psychedelics, "microdosing," and legalization, and she received frequent positive feedback and reinforcement that she was effectively practicing a form of harm reduction. Indeed, this is exactly what her co-defendant Rory Rickey told the undercover DEA agent. Ms. Gonzalez rationalized all this to herself without thinking critically about the dangers of drug use and addiction because she was mostly surrounded by people who were not so afflicted. She minimized to herself what addiction and dependence looked like—while also developing a habit using GHB daily to calm her social anxiety. And, she sought to reassure herself that the proceeds were all being saved to buy some rural land to build a retreat center. Notably, Ms. Gonzalez was not living lavishly; she drove a Toyota van, and she and Colin shared a rented bedroom that cost approximately $1700 per month. They rented from another Stanford graduate who is a geospatial engineer.

Ms. Gonzalez was introduced to the undercover government agent that ultimately arrested her by a friend (working as a confidential informant) who had begun formulating benzodiazepines (like Xanax) and distributing fake Adderall pills that were not contaminated with fentanyl, like so many illicit substances increasingly were. Stanford graduate students, engineers, and tech workers were looking for Adderall, especially as a nationwide shortage in legitimate stock occurred in 2023, and prescriptions ran out. The key amphetamine ingredient for Adderall was not available, and so what Ms. Gonzalez sold was a similar substance, desoxyn. It was not something that she had ever sold

previously in such large quantities prior to meeting the government's undercover agent; she did so in this case because of her belief that the government's confidential source was vouching for the undercover agent, and that he was also safety-minded. The "menu" that the group sent included some extremely naïve cautionaries: "Please use responsibly, take care of each other, drink water, and play outside!" And: "Harm reduction best practices: Do not mix 'downers' aka central nervous system (CNS) depressants like GHB, ketamine, Xanax/benzos, opiates, alcohol." The undercover agent requested cocaine and then 4,000 fake Adderall pills and Ms. Gonzalez obliged, after seeking assurances that "we are sharing responsibility rather than contributing to addictions that are damaging people." After several such sales, the government obtained a search warrant for a residence on the peninsula and found a stockpile of drugs, including mushrooms, marijuana, ketamine, MDMA, psychedelics, and a kilogram of fentanyl-contaminated cocaine that had been placed in a box labeled "DO NOT OPEN."

The fentanyl epidemic was in large part what drove Ms. Gonzalez into selling cocaine and fake Adderall in the first place. In 2021-22, fentanyl was increasingly being introduced into other illicit substances, such as methamphetamine and cocaine, by drug manufacturing sources in Mexico and China. Overdoses by users of other stimulant increased over 40% during the fentanyl epidemic.[3] Many victims overdosed because they did not realize they had ingested fentanyl. The impact of the fentanyl epidemic was not only felt on the streets of the Tenderloin, of course; it was also felt in suburban neighborhoods around the Bay Area, on college campuses, at concerts and festivals, etc. Sadly, many of us in the community know of somebody who accidentally overdosed on a contaminated pill or designer "club drug."

Nationally, there were a range of responses, and debate about the most effective public policy intervention. On the one hand, of course, were stark billboard warnings by the DEA about the lethal effects of even a tiny amount of fentanyl—warnings which are often featured in the government's sentencing memorandums. Other segments of the traditional policy establishment advocated for

---

[3] Brian Mann, NPR, "Overdose deaths surged in pandemic, as more drugs were laced with fentanyl," Apr. 22, 2021, *available at* https://www.npr.org/sections/health-shots/2021/04/22/989833102/overdose-deaths-surged-in-pandemic-as-more-drugs-were-laced-with-fentanyl (last accessed Mar. 9, 2025).

DEFENDANT'S SENTENCING MEMORANDUM
*GONZALEZ*, CR 23–345 TLT

greater investment in harm reduction strategies. In 2021, at President Biden's urging, Congress earmarked $30 million specifically for evidence-based harm reduction services, the first time Congress had specifically appropriated funds for such purposes.[4] The following year, former New York City mayor and Presidential candidate Michael R. Bloomberg's charitable initiative, Bloomberg Philanthropies, funded a $120 million public health project to promote harm reduction strategies and to provide free "safe access" tools like fentanyl testing strips, and the opioid antagonist naloxone. In announcing the venture, which was a combined effort by the federal Centers for Disease Control and Prevention (CDC) Foundation (a non-profit created by Congress to support the CDC), the Pew Charitable Trust, and John Hopkins University, the group argued: "Many of these tragedies could have been prevented if harm reduction measures were in place and at scale. Although the Biden Administration began funding harm reduction last year, most federal- and state-directed overdose prevention efforts do not focus on these proven, life-saving measures."[5]

Already ensconced in the psychedelics and health community, Ms. Gonzalez was clearly predisposed to the promise of harm reduction. Reports of overdoses in the community and in the news, rather than prompting the group to avoid or end their involvement in drugs, led Ms. Gonzalez to believe that she was instead mitigating the problem. When the government executed its search warrant on 74 Henderson Place, where Mr. Gaestel was arrested and most of the substances were found, agents also found NarcoCheck ID Test kits for cocaine and fentanyl safety test strips. The group was meticulous about testing drugs for contaminants and actively promoted and encouraged safe practices among those who were buying them—checking in, for example, with customers about their use. Of course, Ms. Gonzalez seriously deceived herself that she was reducing harm by selling

---

[4] *See* Abby Goodnough, "Helping Drug Users Survive, Not Abstain: 'Harm Reduction' Gains Federal Support," *The New York Times*, June 27, 2021, *available at* https://www.nytimes.com/2021/06/27/health/overdose-harm-reduction-covid.html (last accessed Mar. 9, 2025).

[5] "Largest-ever harm reduction ad campaign to run in conjunction with memorial to generate support for solutions to growing overdose crisis, including full-page New York Times ad and TV spots," Vital Strategies Press Release, Feb. 14, 2022, *available at* **https://www.vitalstrategies.org/largest-ever-harm-reduction-ad-campaign-to-run-in-conjunction-with-memorial-to-generate-support-for-solutions-to-growing-crisis-including-full-page-new-york-times-ad-and-tv-spots/** (last accessed Mar. 9, 2025).

substances that, even if uncontaminated with fentanyl, were still inherently risky.

Those risks became tragically clear when an acquaintance who lived in Southern California overdosed on the cocaine that was contaminated with fentanyl that he had purchased for the group and indulged in himself before it was tested. He had met up with Ms. Gonzalez's co-defendant Matthew Sestak in Southern California and the two spent the night in a hotel room Ms. Gonzalez paid for because Mr. Sestak was unwell. In the morning, Mr. Sestak left the hotel room to return to Northern California, his companion still snoring. Hours later, however, hotel staff apparently found that he had overdosed while sleeping in bed. Ms. Gonzalez was devastated, but the experience seemed to reinforce the necessity of careful testing and other harm reduction measures. The group did not know what to do with the contaminated cocaine and sealed it in a container marked "DO NOT OPEN," which is how the government found it during its search months later.

Since Ms. Gonzalez's arrest, she has devoted herself to resetting her life. She is grateful for the opportunities provided to her while on bail. After her arrest, she began working as an architectural assistant, supporting an architect in drawing up plans and related tasks. She spent time on her small wellness company, Beselan Botanicals, with Colin. Over the last summer, Ms. Gonzalez worked as a legislative aide for a Berkeley City Council member and vice mayor. Then, in the fall, Ms. Gonzalez returned to Stanford to continue making progress toward earning her Master's degree, which she had given up years earlier. She currently has one academic quarter remaining; if permitted, Ms. Gonzalez would finish her degree in June 2025. On holidays, she has traveled within California and out of state to visit her family and Colin's family, with the Court's permission. During the pendency of this case, Ms. Gonzalez has never tested positive for any substance or sustained any other pretrial violations.

## III.    PRESENTENCE REPORT & GUIDELINES

The defense's substantive objections to the Presentence Report (PSR) have mostly been resolved. Three items remain:

*First*, the probation officer alerted the parties the day before the final PSR was due to the Court that U.S. Probation had concluded that the downward role adjustment because Ms. Gonzalez is a Zero-Point Offender (with no prior criminal history) under U.S.S.G. § 4C1.1(a) does not apply because of the upward adjustment as an "organizer" or "leader" under U.S.S.G. § 3B1.1(c). The

Zero-Point Offender downward adjustment was included in draft PSR, and neither party objected. That is because the defense and the government take the position, as reflected in the parties' plea agreement, that Ms. Gonzalez should nevertheless get the benefit of -2 adjustment, as a Zero-Point Offender. Accordingly, the parties are committed to the position that her Guidelines should be calculated as a Total Offense Level 27. For either party to claim otherwise would breach the plea agreement and deny Ms. Gonzalez the benefit of its terms, especially as the Guidelines bear directly on the government's sentencing recommendation. *See* Plea Agrmt. (Dkt. No. 115) ¶ 16 ("The government agrees to recommend a sentence no higher than the low end of the guideline range in paragraph 7…"). Even if the Court agrees with Probation, however, the parties' agreement is a compelling reason to vary downward in order to honor the benefit of the bargain struck by the government and Ms. Gonzalez. Indeed, it is common practice in this district for Courts to calculate the Guidelines as they see them under the law, and then because the Guidelines are merely advisory, exercise discretion to also give full credit to any benefits negotiated by the defendant with the government in a plea agreement by varying downward. (To ignore the plea agreement's terms would, in the long run, chill plea negotiations between the government and defendants—a result that benefits no one.) Accordingly, the defense respectfully objects to the removal of the Zero-Point Offender downward adjustment from the PSR and urges the Court to effectively honor the Total Offense Level (TOL) of 27 set forth in the plea agreement.

*Second*, for reasons that are not clear, the PSR does not appear to fully credit the parties' plea agreements for Ms. Gonzalez, Mr. Gaestel, and Mr. Rickey, each of which included a two-level downward adjustment of the offense level if all three defendants agreed to resolve the case via plea agreements before September 30, 2023, without filing motions or conducting other litigation. *See* Plea Agrmt. (Dkt. No. 115) ¶¶ 7-8; PSR ¶ 63 & fn. 1. The defendants complied and all plead guilty by the fixed date, and therefore Ms. Gonzalez's TOL should be reduced two levels.

Section 5K2.0(a)(2)(B) of the U.S. Sentencing Guidelines, under which this particular provision was entered, is a catch-call provision that permits the parties to recommend an adjustment to the Guideline calculation where "there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence."

The Guidelines do not otherwise provide any adjustment for global dispositions; accordingly, when multiple defendants simultaneously agree to resolve a case early in proceedings, thereby saving the government significant litigating resources, subsection (a)(2)(B) is often used to support a downward adjustment of -2 or -3 levels.

Notably, there is no specific guidance in the commentary to the Guidelines or in the case law to suggest when a -3 or -2 adjustment is appropriate for a global disposition under § 5K2.0(a)(2)(B). Here, defense counsel for Ms. Gonzalez, Mr. Gaestel, and Mr. Rickey jointly requested in plea negotiations that the government agree to an adjustment of -3 levels, rather than just -2, because the Base Offense Level (BOL) in this case for Ms. Gonzalez and Mr. Gaestel, in particular, is relatively high—over 30 levels to begin. *See* Presentence Report (PSR) ¶ 54. A *greater* discount for a group resolution therefore makes sense because the *size* of the adjustment is keyed to the overall scale of offense level. Analogously, when a defendant pleads guilty and the resulting offense level is above 16, the Guidelines automatically confer a -3 rather than a -2 adjustment as a benefit for acceptance of responsibility. *See* U.S.S.G. § 3E1.1(b). Here, an adjustment for a group disposition should work the same way.

The defense also pointed out that the government had recently provided a greater -3 adjustment to four defendants for a group resolution in a Hobbs Act "armed takeover" robbery case, *United States v. Faavesi*, 23-CR-248 AMO, even though the calculated Offense Levels under the Guidelines were generally lower (in the 20s), and the crime itself was *far* more dangerous. According to the government's sentencing memoranda in the *Faavesi* case, numerous suspects coordinated a highly-coordinated, broad daylight armed robbery of a jewelry store at the City Center Bishop Ranch Shopping Center in San Ramon; two gunman held security guards and employees at gunpoint and five others smashed glass cases, before fleeing in concert with over $1 million in jewelry; during the flight from the scene the group committed hit-and-run accidents; and, witnesses and hostages described being traumatized and terrified. Some of the *Faavesi* defendants had serious prior criminal histories, and when executing search warrants, law enforcement found weapons and significant amounts of drugs. Obviously, the instant case for Ms. Gonzalez and her co-defendants does not come close to the seriousness of the *Faavesi* case. The government nevertheless refused to accord Ms.

Gonzalez, Mr. Gaestel, and Mr. Rickey, the same -3 adjustment that was offered to the defendants in *Faavesi*. Had the government agreed, Ms. Gonzalez's Total Offense Level would be 26, rather than 27. Ms. Gonzalez stands by the terms of her plea agreement; however, and as set forth below, the arbitrary disparity in the Guideline calculation based on the -2 rather than -3 adjustment under § 5K2.0(a)(2)(B) is grounds for a further downward variance by the Court.

*Third*, the defendant respectfully objects to statements by the government's case agent that are entirely unsupported, prejudicial, and yet were included in the final PSR. *See* PSR ¶ 52. It would be reversible error for the Court to rely on information or facts that are unsupported in the record when sentencing Ms. Gonzalez. *See United States v. Torres-Giles*, 80 F.4th 934, 939 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 616, 217 (2024). "A district court procedurally errs at sentencing if it imposes a sentence based on 'clearly erroneous facts.'" *Id.* (quoting *United States v. Burgos-Ortega*, 777 F.3d 1047, 1056 (9th Cir. 2015)). "'A finding is clearly erroneous if it is illogical, implausible, or *without support in the record*.'" *Id.* (emphasis added).

Here, the agent's claim about a purported nickname ("The Queen") did not appear anywhere in the government's discovery, and for that reason the defense objected to the PSR and asked that the agent's commentary about it be removed from the PSR. Now, the government has produced some text messages from the confidential source using the name. In any case, the unsupported but implicit suggestion that the nickname may refer to Ms. Gonzalez's status somehow in connection with drugs, as opposed to anything else, is highly prejudicial. The agreed upon facts in the plea agreement acknowledge that Ms. Gonzalez used the name "Soter" for anonymity, not "The Queen." At most, the latter was a nickname used by the confidential source and the confidential source's friend Mr. Sestak to refer to Ms. Gonzalez, in light of her desire to start a retreat center and have a family.

Likewise, the claim that "[a]gents suspected she may have a substantial amount of money available in the form of cryptocurrency," is, on its face, complete speculation that is again unsupported by anything in the record. In fact, the DEA seized Ms. Gonzalez's cryptocurrency and cash at the time of her arrest and she has agreed to forfeit it in her plea agreement. *See* Plea Agrmt. (Dkt. No. 115) ¶ 10. She has also made complete financial disclosures to U.S. Probation, which do not include any "substantial amount of money" in cryptocurrency or otherwise. In recognition of as

much, the Court has already found that Ms. Gonzalez is indigent. U.S. Probation agrees she is indigent and recommends waiving a criminal fine. PSR ¶ 104. Accordingly, the agent's mere erroneous speculation that Ms. Gonzalez is secretly rich is absurd, disproven, and as such, must not factor into the district court's sentencing decision.

On Sunday, March 23, 2025, government counsel belatedly notified defense counsel by email that the government was unable to complete its forfeiture of the cryptocurrency wallets that it had obtained access to, and possession of, nearly a year and half ago when search and arrest warrants were executed, at the very beginning of the case. In the email defense counsel received, no explanation was provided by government counsel as to why the issue was raised so late, just days before sentencing. Defense counsel has also received no discovery on this matter, or any detailed explanation of why there is supposedly a problem. Nevertheless, Ms. Gonzalez intends to meet her obligations under the parties' plea agreement and does not anticipate that the government will have problems seizing the money unless it has created some problem of its own making. In any case, at this juncture, the government has provided no explanation of the issue, and it should not delay sentencing because Ms. Gonzalez has complied with her commitments in the plea agreement.

*Fourth*, and finally, the Court itself raised a host of questions at a status conference on March 21, 2025, regarding Ms. Gonzalez's compliance with the conditions of her pretrial release, as to her travel and access to computer applications. The docket and full record in this case reflects that Ms. Gonzalez has complied with her conditions. No other party—including the government, U.S. Pretrial Services, or U.S. Probation—contends otherwise. There is no dispute, or question. Ms. Gonzalez's record on pretrial release therefore strongly counsels in favor of leniency because she has firmly proven herself to be a reliable and trustworthy participant in this proceeding—well beyond the usual defendant.

## IV.   ARGUMENT

Courts have an overarching obligation to impose sentences that are sufficient but not greater than necessary to achieve the goals of § 18 U.S.C. § 3553(a). *Kimbrough*, 552 U.S. at 101 (2007). Although they provide a starting point and should be respectfully considered, the Guidelines are not mandatory and should not be accorded more weight than the other section 3553(a) factors. *Gall v.*

*United States*, 552 U.S. 38, 50 (2007); *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Importantly, not only are the guidelines not mandatory, "they are also not to be presumed reasonable." *Nelson v. Arizona*, 555 U.S. 350, 352 (2009) (emphasis added); *see also Rita v. United States*, 551 U.S. 338, 350-51 (2007). Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Several matters warrant the Court's consideration in connection with the § 3553(a) factors and Ms. Gonzalez's request for a custodial sentence of no more than 30 months:

*First*, as to the circumstances of the offense and Ms. Gonzalez's personal history, a sentence of longer than 30 months would be greater than necessary. The defense recognizes that the circumstances of the offense are very serious. At the end, Ms. Gonzalez was leading a small group of post-grad idealists that were selling a range of psychedelics and two drugs that are particularly harmful—cocaine and desoyxn pills—in an organized fashion and in fairly significant retail quantities out of the misguided notion that they could provide "safe access" to seemingly-responsible recreational drug users such as tech workers, festival-goers, and the like. Rather than spending lavishly, Ms. Gonzalez further rationalized her behavior by renting a cheap bedroom in a shared house and saving the proceeds in hopes of buying some rural land to lead spiritual retreats. Ms. Gonzalez also of course justified her course of conduct by conceiving of it as harm reduction that minimized the risks posed by fentanyl, in particular; she was primed to believe that by her background and recent immersion in a community that was "drug positive." Even with safety testing strips, well-meaning warnings, and all of her compassion and idealism, however, Ms. Gonzalez could

not guarantee the safety of those purchasing drugs. The overdose of the group's acquaintance (and Ms. Gonzalez's personal friend) showed as much, even if his death was not directly her fault personally. This was the worst part of the group's offense, and Ms. Gonzalez will have to live with it.

There are, however, some mitigating factors in the case. Tellingly, Ms. Gonzalez and her co-defendants did not even know how to dispose of fentanyl-contaminated cocaine, which shows their naivety and lack of long experience dealing such substances. Ms. Gonzalez and her co-defendants also certainly do not resemble most drug dealing circles that are sentenced before the Court: this was not a criminal street gang, they did not have weapons and certainly made no threats; they were not trying to prey on folks struggling with addiction; and they did not live lavishly off the proceeds. Instead, Ms. Gonzalez and others and others believed in decriminalization and naively aspired to harm reduction principles. Although it is true that Ms. Gonzalez was the organizer of the group and was saving its profits to build a retreat center, she has fully taken responsibility for her role and forfeited everything she had such that she is now indigent (her finances are set forth at PSR ¶ 102).

She has also paid a significant price for her position as organizer. As a result of the role adjustment applied under the Guidelines, Ms. Gonzalez could not obtain the benefit of the provisions of safety valve, which would have otherwise lowered her Offense Level under the Guidelines by two levels. Worse, and also because of that role adjustment, Ms. Gonzalez is actually ineligible for Earned Time Credits (ETCs) under the First Step Act, *see* 18 U.S.C. § 3632(d)(4)(D)(Ixviii), which places her in the same category of sex offenders, terrorists, spies, and others who are not able to earn credits for an earlier release date based on participation in programming. (Eligible prisoners can earn up to 10-15 days off their sentence by successfully completing 30 days of qualifying rehabilitative programming.) As a result, whatever sentence the Court imposes, Ms. Gonzalez's release date will not be reduced by the Bureau of Prisons (BOP) accordingly, and she will not be sent to a halfway house early due to programming, like most other defendants. Ms. Gonzalez will likely serve nearly all of any custodial term the Court imposes. This is a reason to show lenience and reduce Ms. Gonzalez's sentence, accordingly.

Ms. Gonzalez is also likely to be punished more severely than those who had lesser roles. Strikingly, her co-defendants Mr. Sestak and Mr. Rickey appear to be poised to walk away from the

case with a conviction but (if all goes well for them) no custodial sentence. Mr. Sestak, of course, was enrolled in the Court's Convictions Alternatives Program (CAP) and Mr. Rickey's sentence is currently deferred to the fall so that he may continue to rehabilitate himself out of custody prior to sentencing. Mr. Gaestel also deserves a lesser sentence. Ms. Gonzalez recognizes Mr. Gaestel has a prior conviction in unfortunate circumstances, but the truth is he played a lesser role and was involved with the group for only a brief amount of time. That leaves Ms. Gonzalez, who recognizes that she is likely to have to serve a prison sentence. Although she was abusing the depressant GHB habitually up to the time she was arrested, she will not get the benefit of a diversion program like CAP. As noted above, she will not even get any Earned Time Credits. Thus, while Ms. Gonzalez must be held responsible for her role, she is being severely punished. Due to the role adjustment, the Guidelines significantly increase on her advisory exposure, and the First Step Act limits her ability to earn an early release, while the government has endorsed relatively lenient sentences for her co-defendants.

Ms. Gonzalez's personal circumstances also counsel in favor of lenience. She is an earnest and promising young woman, and as her supporters' letters to the Court attest, Ms. Gonzalez is a beloved figure to those around her. Ms. Gonzalez was a valued member of her community growing up in Bailey, Colorado. For example, her friend Sarah Ahl writes to the Court about Natalie's exceptional support when Ms. Ahl tragically lost her father in a car accident as a young child:

> While many of my friends were kind and compassionate, few truly understood how to support me during such a devastating time. Natalie, however, stood apart. From a young age, she has possessed an innate ability to understand and meet the emotional needs of others. She offered unwavering support to me and my family following my father's death, making me feel seen and heard during moments of vulnerability and anger. Her presence provided me comfort and reassurance, helping me ease back into school and establish some semblance of routine. She prioritized my well-being, encouraging me to find happiness and, in turn, to begin rebuilding a sense of normalcy in my life.

Rizk Decl., Ex. A at 51-52 (letter of Sarah Ahl). Remarkably, Ms. Ahl's letter is not alone in this regard. *Many* of the other letters simply shine with appreciation for Ms. Gonzalez's compassion and interpersonal support. Aaron Moss, for instance, met Ms. Gonzalez just last year and she made a significant difference in his life, helping him pull himself out of terribly difficult circumstances:

> During that summer, I lost my RV and found myself without a home. To top it off, I also had my computer stolen out of my car–a real storm of bad luck all at once for me. I was in

desperate need of help at that time, and Natalie was crucial for me getting back on my feet. She worked with me to set up a marketing strategy that helped bring in the money that I needed. She helped me find an affordable living situation given my financial circumstances. She helped me buy a computer even though they were struggling financially so I could get back to work. For all of the ways she has shown up for me, I can say without any reservations that Natalie was the main reason why I didn't fall into despair and why I now have a successful business in pursuing my dream of being an independent bodyworker.

*Id.*, Ex. A at 9-10. It is extremely rare to find a person so cherished by her community as a defendant in a federal criminal case such as this one.

It is equally unusual to find such a smart and talented individual in such a case before the Court. Ms. Gonzalez was recognized as a rare talent early and earned a national scholarship that helped support her education starting in middle school, then earned full financial aid at Stanford. To be clear, this was not due to her privilege; her family would not have otherwise been able to support her education. She earned her opportunity to receive a prestigious education on the merits. Notably, too, throughout her life Ms. Gonzalez has otherwise pursued socially productive and healthy goals, enriched the lives of those around her, and contributed to her community by working in primary school educational programs, volunteering, and devoting herself to environmentally friendly and sustainable development and housing. And of course, that is at the heart of the puzzle: how did such a thoughtful and promising young woman make such significant mistakes? There is no simple answer; it was a confluence of factors that includes Ms. Gonzalez's background, the environment at home when she was growing up, at an alternative-minded coop at Stanford, and after graduating, her own curiosity about the therapeutic qualities of some less dangerous drugs such as psychedelics. The defense urges the Court to hear out Ms. Gonzalez on this point, as she plans to allocate at the hearing. It is her own insight and reflection on her decision making that arguably matters most for her future.

Relatedly, it is also critically important to point out that this case is not going to extinguish Ms. Gonzalez's star. This case, and any sentence Ms. Gonzalez has to serve, will be just another chapter in her life that she looks back upon, and she will continue to be the same amazing person she is today and has been in the past. As hard as any sentence may be, and as much as it will undoubtedly alter Ms. Gonzalez's life experience, her future is bright. She will go on to a more productive career. In view of all that, Ms. Gonzalez would also benefit from the Court's assistance and mentorship after her release. Given her peculiar circumstances and promise, she respectfully asks the Court for a sentence

that allows her to fulfill her potential with the Court's support.

*Second,* just punishment, deterrence, and public safety considerations, support the requested sentence of no greater than 30 months. Even a 30-month sentence is an extraordinarily long sentence for a first-time non-violent offender, and it is going to change Ms. Gonzalez's life and perspective. It is guaranteed to be extremely punitive. In the run of defendants committed to the custody of the Bureau of Prisons, she is unfortunately likely to be among the very least prepared for such an experience. Ms. Gonzalez herself is understandably extremely scared of what the sentence may bring for her; she is fearful of the trauma that it will necessarily entail, the lost time, and the consequences it may have for her in the future as somebody who wants to have a family. The sentence will necessarily interrupt those plans, and set her back financially by taking years out of the prime of her working life at a time when she is already indigent. Relatedly, the conviction and the sentence will make finding employment for her far more challenging in the future. That is quite enough punishment in this case, and it is achieved by a sentence of 30 months or less. A marginally longer sentence of 36 or 40 or 48 months will not actually accomplish something more for the Court that a sentence of 30 months or less cannot achieve. An even longer sentence risks being profoundly counterproductive, given Ms. Gonzalez circumstances. An even longer sentence would sink her deeper into poverty, potentially threaten her ability to have a family, and profoundly demoralize her at a time in her life when she needs to be mustering her energy to begin again.

As to public safety and deterrence considerations, the defense respectfully submits that the recommended sentence is sufficient. Again, a 30-month sentence for a non-violent drug offender with no prior record is an extremely stiff penalty. There is no realistic prospect that Ms. Gonzalez herself, especially given the more meaningful and attractive options she will have when she is released, would ever return to selling drugs, or using drugs. The consequences of a 30-month sentence are already personally devastating. In particular, the prospect of a lengthy sentence is extremely hard news for a woman who dreams of a future in motherhood, and especially for a woman who is already haunted by the fear that she should have had a child earlier in life.

To be clear, Ms. Gonzalez poses no realistic public safety threat. The punitive intervention that her arrest and this case represents is already massive; and that intervention has plainly had effect. Ms.

Gonzalez has demonstrated in response to this case and the restrictions it has already imposed, that she is reliable and trustworthy through her performance on pretrial release. She has remained in touch and in compliance with U.S. Pretrial Service's requirements at every single juncture, and she has taken more than a few trips around the state and the country without any issues whatsoever— obtaining pre-approval, complying with the requirements, and returning to the District exactly as required every single time. Ms. Gonzalez is going to be equally dependable on post-release supervision because is smart and has a bright future ahead of her. Her term of supervised release will ensure that the Court has ample information about her well-being to ensure any future concerns about public safety.

The defense anticipates the government will nevertheless argue that Ms. Gonzalez's education and intellect, the degree of organization within the group, and the group's use of secure chat application and cryptocurrency, demonstrates that the offense was committed in a cold and calculated manner that should be punished particularly severely to achieve deterrence. That contention runs headlong into reality, however. Ms. Gonzalez and her co-defendants never *researched* the country's drug laws to gauge how much exposure they might face by their conduct. Of course, she and her co-defendants knew that distributing controlled substances was against the law, and they did not want to be arrested, but they certainly did not calibrate their behavior against any idea of what the legal consequences could be, or how a state case against them might differ from a federal case. They are now in federal court, facing among the most serious available charges that could have been brought, and the length of the sentence that Ms. Gonzalez could conceivably receive is another matter entirely. She had no idea. None of her co-defendants could have possibly predicted that Mr. Sestak and Mr. Rickey would have a chance to walk away from the case with a term of supervision alone, while Mr. Gaestel and Ms. Gonzalez would be facing multiyear prison sentences demanded by the federal government. Like most offenses, this one was not committed in a coldly rational manner. It was unusual, instead, because it was committed in a particularly naïve and misguided manner.

Moreover, to the extent that a longer custodial sentence might seem to the Court to promise greater deterrent effect, some of the most recent evidence from the Sentencing Commission reveals that there is no deterrent effect from federal sentences imposed that are less than 60 months; a longer

or shorter sentence under that threshold has no statistical impact on the likelihood of recidivism.[6]

Accordingly, there is no empirical basis to believe that a longer sentence of, say, 48 months as

Probation recommends, would achieve greater deterrent effect than a 30-month sentence or even an

18-month sentence.

     *Third*, as to educational, vocational, medical, or other correctional treatment, no greater

custodial sentence is going to provide Ms. Gonzalez any benefit. She will not be eligible for any kind

of beneficial programming by serving a sentence, and instead, the longer the sentence, the longer it

will delay the completion of her education and her return as a contributor to her community. Of

course, we can hope that Ms. Gonzalez may improve the lives of other inmates while serving her

sentence—and, given the letters received, defense counsel expects that is exactly what she will do—

but in any case, a longer sentence is certainly not going to serve Ms. Gonzalez herself. A longer

sentence than 30 months will only hold her back.

     *Fourth*, and finally, the Court is charged with honoring the "need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of similar

conduct." 18 U.S.C. § 3553(a)(6). The Guidelines range here is excessive, as the national sentencing

data clearly demonstrates. The defense's requested sentence is directly within the norm nationally for

cases involving methamphetamine. As the defense explained to U.S. Probation in its objections letter,

should the Court accept a two-level reduction pursuant to U.S.S.G. § 5K2.0(a)(2)(B), of course, and

applied the spirit of the parties' agreement that Ms. Gonzalez should get the benefit of the Zero-Point

Offender adjustment the Final Offense Level would be 27. The JSIN data teaches that during the last

five fiscal years (FY2019-2023), there were 2617 defendants whose primary guideline was § 2D1.1

and "Methamphetamine (actual)" was the primary drug type, with a Final Offense Level of 27 and a

Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial

assistance departure. For the 2,584 defendants (99%) who received a sentence of imprisonment in

---

[6] U.S. Sentencing Commission, *Length of Incarceration and Recidivism*, June 2022 at 4 ("For federal offenders sentenced to 60 months or less incarceration, the Commission did not find any statistically significant differences in recidivism."), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf (last accessed Mar. 21, 2024).

whole or in part, the average length of imprisonment imposed was 35 months and the median length of imprisonment imposed was 30 months. Given all of the extremely unusual circumstances present here, the defense respectfully urges the Court to consider a sentence given that this is norm nationally across all such cases, and sentence Ms. Gonzalez to no more than 30 months in custody.

To be clear, a sentence of 70 months, as the government recommends, would be far greater than necessary, and in particular, excessive when compared to the results for her co-defendants. Such a lengthy sentence—well over five years—is an *extremely* long sentence for a non-violent drug case where the defendant has no prior record. Accordingly, the need to avoid disparities does not require a longer sentence.

## V.    CONCLUSION

For all the reasons set forth above, Ms. Gonzalez respectfully asks the Court to sentence her to a custodial sentence of no more than 30 months, followed by three years of supervised release.


Dated:    March 25, 2024                    Respectfully submitted,


_____
DAVID W. RIZK
RIZK & SHEARER LLP
Counsel to Ms. Gonzalez